**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

JOHN C. STOJETZ,

       Petitioner,

    v.                            **Case No.  2:04-cv-263
                                     JUDGE GREGORY L. FROST**

TODD ISHEE, Warden,            **Magistrate Judge Norah McCann King**

       Respondent.

## OPINION AND ORDER

Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this Court a habeas corpus action under 28 U.S.C. §2254.  This matter is before the Court upon petitioner's first motion for discovery (Doc. # 46), respondent's memorandum in opposition (Doc. # 52), and petitioner's reply (Doc. # 44).

### I.  Overview

Petitioner was convicted and sentenced to death for the aggravated murder of seventeen-year-old Damico Watkins while both were incarcerated at the Madison Correctional Institution ("MaCI").  Petitioner and five other adult inmates who were members of, or associated with, the Aryan Brotherhood, stormed the "Adams A" juvenile unit armed with shanks and took the master keys from the corrections officer on duty, after which Watkins was stabbed several times in his cell, chased around both floors of the juvenile unit, and stabbed repeatedly until he collapsed and died on the upper range of the unit.  Petitioner has at all times maintained that he sought to fight Watkins while his accomplices prevented other inmates or prison officials from intervening; however, he never intended to kill Watkins nor did he intend that any other inmates, at his (petitioner's) direction or of their own volition, kill Watkins.  Petitioner argues that the

discovery he seeks will assist him in proving claims of constitutional deprivation, specifically, claims of ineffective assistance of counsel, prosecutorial misconduct, and actual innocence (both as a free standing claim and as a gateway claim). According to petitioner, the discovery he seeks will reveal evidence that contradicts the case that the prosecution presented at petitioner's trial demonstrating that petitioner ordered that Watkins be killed, and/or failed to stop Watkins from being killed, and/or delivered some of the fatal knife blows himself. That evidence, petitioner argues, will assist him in proving his constitutional claims of actual innocence, ineffective assistance of counsel, and the withholding of material, exculpatory evidence by the prosecution.

Respondent opposes petitioner's discovery requests, arguing that petitioner cannot meet the standards for habeas corpus discovery and that petitioner's requests amount to an attempt to retry his case in federal habeas corpus.

## II. Discovery Requests

Petitioner's expansive discovery requests fall into four categories: (1) records and documents; (2) forensic, trace, and physical evidence; (3) statements and reports; and (4) depositions. The Court sets forth petitioner's requests verbatim below:

### 1. Records and Documents

A.    <u>Madison Correctional Institution</u>:

(1)    A complete inventory of all of the investigative files and inventory of the contents of the investigative files of the Madison Correctional Institution (MaCI) concerning its investigations(s) into the death of Damico Watkins and/or prosecutions of John Stojetz, his codefendants, accomplices or others for the murder of Damico Watkins, whether a part of criminal proceedings, internal security, disciplinary, or other review, civil proceedings, or other purposes, including but not limited to all photographs, videotapes, audiotapes, statements, interviews, depositions, reports, analysis, and other materials;

(2)    A copy of the complete MaCI investigative files concerning its

2

investigation(s) into the death of Damico Watkins and/or the prosecutions of John Stojetz, codefendants, accomplices or others for the murder of Damico Watkins, whether a part of criminal proceedings, internal security, disciplinary, or other review, civil proceedings, or other purposes, including but not limited to all photographs, videotapes, audiotapes, statements, interviews, depositions, reports, analysis, and other materials;

(3)     Any and all records concerning Damico Watkins' association in, or with gangs, or gang activities, in the possession of or accessible to MaCI, and including but not limited to all records, reports and files of all gang membership or gang activities of Damico Watkins at MaCI or elsewhere;

(4)     Any and all records and files concerning John Stojetz's alleged association in, or with gangs, or gang activities, whether in the possession of or accessible to MaCI, and including but not limited to all records, reports and files of all gang membership or gang activities of John Stojetz at MaCI or elsewhere;

(5)     Any and all records and files concerning Jerry Bishop, David Lovejoy, Phillip Wierzack or Wierzgac, James R. Bowling and William Vandersommen alleged association in, or with gangs or gang activities, whether in the possession of or accessible to MaCI, and including but not limited to all record, reports and files of all gang membership or gang activities of Jerry Bishop, David Lovejoy, Phillip Wierzack or Wierzgac, James R. Bowling, and William Vandersommen at MaCI or elsewhere;

(6)     Any and all records concerning Doug Haggerty's association in, or with gangs, or gang activities, in the possession of or accessible to MaCI, and including but not limited to all records, reports and files of all gang membership or gang activities of Doug Haggerty at MaCI or elsewhere;

(7)     Any and all records concerning security issues, altercations, fights, assaults, or other incidents involving Doug Haggerty at MaCI or elsewhere;

(8)     A complete list of all MaCI staff including but not limited to employees, correctional officers, counselors, administrative personnel, medical personnel, mental health specialists and others in April, 1996;

(9)     The complete personnel files of MaCI staff members,

    a.     Corrections Officer Michael Browning,
    b.     Captain Tom Swyers,
    c.     Corrections Officer Jeff Jones,
    d.     Lieutenant Robinson,
    e.     Unit Manager Mark Stanley,

3

   f. Deputy Warden Mark Saunders,
   g. Administrative Assistant Walt Ashbridge,
   h. Corrections Officer Timothy Lee Follrod,
   I. Sergeant Martha Crabtree,
   j. Corrections Officer Barbara Sears,
   k. Corrections Officer J.W. Wolverton,
   l. Corrections Officer Shawn Vasser,
   m. Corrections Officer Terry Campbell,
   n. Corrections Officer Charles B. Krueger,
   o. Sergeant Raymond Campbell,
   p. Corrections Officer Fred R. Chesser,
   q. Corrections Officer Michael Douds,
   r. Corrections Officer Charles Grant Morgan, Jr.,
   s. Corrections Officer John Vanover,
   t. Corrections Officer Cooper,
   u. Lieutenant/Corrections Officer Gerald L. Nelson,
   v. Matthew Robert Meyer

including records of complaints, investigations, reviews, performance reviews, evaluations, and security evaluations of said MaCI employees during the time period 1993-1998;

(10) All time records of MaCI employees, staff and personnel on duty at MaCI for the period of April 20 through April 30, 1996, including but not limited to duty roster sheets, time cards, time clock records, entrance and exit records, sign in sheets, duty logs and employee time reports for each employee, staff member, or other MaCI personnel for said dates.

(11) Records, papers, recordings, transcripts of recordings, and other materials of security reviews of inmates Jerry Bishop, David Lovejoy, Phillip Wierzack or Wierzgac, James R. Bowling and William Vandersommen held anytime on or after April 26, 1996;

(12) Records, papers, recordings, transcripts of recordings, and other materials of Rules Infraction Board proceedings or other disciplinary reviews of Jerry Bishop, David Lovejoy, Phillip Wierzack or Wierzgac, James R. Bowling and William Vandersommen held anytime on or after April 26, 1996;

(13) A complete list of every inmate in Adams Unit A during the month of April, 1996, including race, date of birth, social security number, ODRC inmate number, cell number, known or suspected gang affiliation, and current ODRC status.

B. <u>The Ohio State Highway Patrol</u>:

(1)     A complete inventory of the investigative files and an inventory of the contents of the investigative files of the Ohio State Highway Patrol (OSHP) concerning its investigation(s) into the death of Damico Watkins and/or prosecutions of John Stojetz, his codefendants, accomplices or others for the murder of Damico Watkins whether a part of criminal proceedings, internal security, disciplinary, or other review, civil proceedings, or other purposes, including but not limited to all photographs, videotapes, audiotapes, statements, interviews, depositions, reports, analysis, and other materials;

(2)     The complete investigative file of the OSHP concerning its investigation(s) into the death of Damico Watkins and/or prosecutions of John Stojetz, his codefendants, accomplices or others for the murder of Damico Watkins whether a part of criminal proceedings, internal security, disciplinary, or other review, civil proceedings, or other purposes, including but not limited to all photographs, videotapes, audiotapes, statements, interviews, depositions, reports, analysis, and other materials;

(3)     Any and all records concerning Damico Watkins' association in, or with gangs or gang activities, whether in the possession of or accessible to the OSHP, and including but not limited to all records, reports and files of all gang membership and gang activity of Damico Watkins at MaCI or elsewhere;

(4)     Any and all records and files concerning John Stojetz's alleged association in, or with gangs or gang activities, whether in the possession of or accessible to the OSHP, and including but not limited to all records, reports and files of all gang membership or gang activities of John Stojetz at MaCI or elsewhere;

C.     The Ohio Bureau of Criminal Identification and Investigation:

(1)     A complete inventory of the investigative files and inventory of the contents of the investigative files of the Ohio Bureau of Criminal Identification and Investigation (BCII) concerning the investigation(s) into the death of Damico Watkins and/or prosecutions of John Stojetz, his codefendants, accomplices or others for the murder of Damico Watkins, whether a part of criminal proceedings, internal security, disciplinary, or other review, civil proceedings, or other purposes, including but not limited to all photographs, videotapes, audiotapes, statements, interviews, depositions, reports, analysis, and other materials;

(2)     The complete investigative file of the BCII concerning its investigation(s) into the death of Damico Watkins and/or prosecutions of John Stojetz, his codefendants, accomplices or others for the murder of Damico Watkins, whether a part of criminal proceedings, internal security, disciplinary, or other review, civil proceedings, or other purposes, including but not limited to all photographs, videotapes, audiotapes, statements, interviews, depositions, reports, analysis, and

5

other materials;

(3)    The complete investigative file of the BCII laboratory, or any other state or private laboratory or forensic examiner, concerning the investigation(s) into the death of Damico Watkins and/or prosecutions of John Stojetz, his codefendants, accomplices or others for the murder of Damico Watkins, whether a part of criminal proceedings, internal security, disciplinary, or other review, civil proceedings, or other purposes, including but not limited to all photographs, videotapes, audiotapes, statements, interviews, depositions, reports, analysis, and other materials;

(4)    Any and all records concerning Damico Watkins/ association in, or with gangs or gang activities, whether in possession of or accessible to the BCII, and including but not limited to all records, reports and files of all gang membership or gang activities of Damico Watkins at the MaCI or elsewhere;

(5)    Any and all records and files concerning John Stojetz's alleged association in, or with gangs or gang activities, whether in the possession of or accessible to the BCII, and including but not limited to all records, reports and files of all gang membership or gang activities of John Stojetz at the MaCI or elsewhere;

D.    <u>The Ohio Department of Rehabilitation and Corrections:</u>

(1)    A complete inventory of the investigative files and inventory of the contents of the investigative files of the Ohio Department of Rehabilitation and Corrections (ODRC) concerning the investigation(s) into the death of Damico Watkins and/or prosecutions of John Stojetz, his codefendants, accomplices or others for the murder of Damico Watkins, whether a part of criminal proceedings, internal security, disciplinary, or other review, civil proceedings, or other purposes, including but not limited to all photographs, videotapes, audiotapes, statements, interviews, depositions, reports, analysis, and other materials;

(2)    The complete investigative files of the ODRC concerning the investigation into the death of Damico Watkins and/or prosecutions of John Stojetz, his codefendants, accomplices or others for the murder of Damico Watkins, whether a part of criminal proceedings, internal security, disciplinary, or other review, civil proceedings, or other purposes, including but not limited to all photographs, videotapes, audiotapes, statements, interviews, depositions, reports, analysis, and other materials;

(3)    Any and all records concerning Damico Watkins' alleged association in, or with gangs or gang activities, whether in the possession of or accessible to the ODRC, and including but not limited to all records, reports and files of all gang membership or gang activities of Damico Watkins at MaCI or elsewhere;

6

(4)    Any and all records and files concerning John Stojetz's alleged association in, or with gangs or gang activities, whether in the possession of or accessible to the ODRC, and including but not limited to all records, reports and files of all gang membership or gang activities of John Stojetz at MaCI or elsewhere;

(5)    Any and all records and files concerning Jerry Bishop, David Lovejoy, Phillip Wierzack or Wierzgac, James R. Bowling and William Vandersommen alleged association in, or with gangs or gang activities, whether in the possession of or accessible to the ODRC, and including but not limited to all records, reports and files of all gang membership or gang activities of Jerry Bishop, David Lovejoy, Phillip Wierzack or Wierzgac, James R. Bowling, and William Vandersommen at the MaCI or elsewhere;

(6)    Any and all records concerning Doug Haggerty's association in, or with gangs, or gang activities, in the possession of or accessible to ODRC, and including but not limited to all records, reports and files of all gang membership or gang activities of Doug Haggerty at MaCI or elsewhere;

(7)    Any and all records concerning security issues, altercations, fights, assaults, or other incidents involving Doug Haggerty at MaCI or elsewhere;

(8)    Records, papers, recordings, transcripts of recordings, and other materials of security reviews of inmates Jerry Bishop, David Lovejoy, Phillip Wierzack or Wierzgac, James R. Bowling and William Vandersommen held anytime on or after April 26, 1996;

(9)    Records, papers, recordings, transcripts of recordings, and other materials of Rules Infraction Board proceedings or other disciplinary reviews of Jerry Bishop, David Lovejoy, Phillip Wierzack or Wierzgac, James R. Bowling and William Vandersommen held anytime on or after April 26, 1996;

(10)    A complete list of every inmate in Adams Unit A during the month of April, 1996, including race, date of birth, social security number, ODRC inmate number, cell number known or suspected gang affiliation, and current ODRC status.

(11)    The complete ODRC personnel files of MaCI staff members,

     a.    Corrections Officer Michael Browning;
     b.    Captain Tom Swyers
     c.    Corrections Officer Jeff Jones,
     d.    Lieutenant Robinson,
     e.    Unit Manager Mark Stanley,
     f.    Deputy Warden Mark Saunders,

g.    Administrative Assistant Walt Ashbridge,
h.    Corrections Officer Timothy Lee Follrod,
I.    Sergeant Martha Crabtree,
j.    Corrections Officer Barbara Sears,
k.    Corrections Officer J.W. Wolverton,
l.    Corrections Officer Shawn Vasser,
m.    Corrections Officer Terry Campbell,
n.    Corrections Officer Charles B. Krueger,
o.    Sergeant Raymond Campbell
p.    Corrections Officer Fred R. Chesser,
q.    Corrections Officer Michael Douds,
r.    Corrections Officer Charles Grant Morgan, Jr.,
s.    Corrections Officer John Vanover,
t.    Corrections Officer Cooper,
u.    Lieutenant/Corrections Officer Gerald L. Nelson,
v.    Matthew Robert Meyer

including records of complaints, investigations, reviews, performance reviews, evaluations, and security evaluations of said MaCI employees during the time period 1993-1998;

E.    The Franklin County and Madison County Coroners' Offices:

(1)    A complete inventory of the files and an inventory of the contents of the files of the Franklin County Coroner's Office and the Madison County Coroner's Office concerning the investigation into the death of Damico Watkins and the prosecutions of John Stojetz, his codefendants, accomplices or others for the murder of Damico Watkins, whether a part of criminal proceedings, internal security, disciplinary, or other review, civil proceedings, or other purposes, including but not limited to all autopsy and pathology records of any sort, including raw notes, reports, tests and test results, photographs, x-rays, histology reports, videotapes, audiotapes, statements, interviews, depositions, reports, analyses, and other materials and all other documentation regarding examination of the body of the deceased, Damico Watkins;

(2)    A complete copy of all files of the Franklin County Coroner's Office and the Madison County Coroner's Office concerning the investigation into the death of Damico Watkins and prosecutions of John Stojetz, his codefendants, accomplices or others for the murder of Damico Watkins, whether a part of criminal proceedings, internal security, disciplinary or other review, civil proceedings, or other purposes, including but not limited to all autopsy and pathology records of any sort, including raw notes, reports, tests and test results, photographs, x-rays, histology reports, videotapes, audiotapes, statements, interviews, depositions, reports, analyses, and other materials and all other

8

documentation regarding examination of the body of the deceased, Damico Watkins.

F.    The Madison County Prosecuting Attorney:

The complete records and files of the Madison County Prosecuting Attorney Stephen J. Pronai and Assistant Prosecuting Attorney Daniel A. Huston, their successors, investigators and staff concerning the investigation(s) into the death of Damico Watkins and/or prosecutions of John Stojetz, his codefendants, accomplices or others for the murder of Damico Watkins, whether a part of criminal proceedings, internal security, disciplinary, or other review, civil proceedings, or other purposes, including but not limited to all photographs, videotapes, audiotapes, statements, interviews, depositions, reports, analysis, and other materials.

G.    Other State, Local and Federal Law Enforcement Authorities:

(1)    All inventories of evidence and lists of all evidence, including but not limited to forensic evidence and physical evidence, obtained, seized, examined, created, used, or otherwise referenced, by any state, local or federal law enforcement agency in the investigation(s) into the death of Damico Watkins and/or prosecutions of John Stojetz, his codefendants, accomplices or others for the murder of Damico Watkins, whether a part of criminal proceedings, internal security, disciplinary, or other review, civil proceedings, or other purposes, including but not limited to all photographs, videotapes, audiotapes, statements, interviews, depositions, reports, analysis, and other materials;

(2)    All inventories of statements and lists of all statements, including but not limited to statements obtained from witnesses, employees of the MaCI, the OSHP, the ODRC, the BCII, the State of Ohio or other state, local or federal law enforcement agencies, or from fact witnesses, suspects, defendants, codefendants or accomplices during the investigation(s) into, or prosecutions of John Stojetz, codefendants, accomplices or others for the murder of Damico Watkins, whether a part of criminal proceedings, internal security, disciplinary, or other review, civil proceedings, or other purposes, including but not limited to all photographs, videotapes, audiotapes, statements, interviews, depositions, reports, analysis, and other materials;

(3)    An inventory of all items of evidence, papers, depositions, statements, pleadings, settlement papers, discovery, and all other materials pertaining to any legal action involving the ODRC, OSHP, the BCII, the State of Ohio, and/or any political subdivision or individual, brought by or on behalf of Damico Watkins, his estate, and/or his family arising from the death of Damico Watkins, including but not limited to all photographs, videotapes, audiotapes, statements, interviews,

9

depositions, reports, analysis, and other materials;

(4)   A complete copy of all items of evidence, papers, depositions, statements, pleadings, settlement papers, discovery, and all other materials pertaining to any legal action involving the ODRC, OSHP, the BCII, the State of Ohio, and/or any political subdivision or individual, brought by or on behalf of Damico Watkins, his estate, and/or his family arising from the death of Damico Watkins, including but not limited to all photographs, videotapes, audiotapes, statements, interviews, depositions, reports, analysis, and other materials.  This request includes but is not limited to *Watkins v. State of Ohio*, Southern District of Ohio, Case No. 2:96-cv-00515, and *Kimberly Watkins v. Dept. of Rehabilitation and Corrections*, Court of Claims Case No. C 1996-05874 and Case No. C 1998-10760.

H.   Court Records

(1)   The complete trial file, including but not limited to transcripts, pleadings, motions, evidence, and other materials, of the following proceedings arising from the death of Damico Watkins:

(a)     State v. Jerry Bishop; Madison County Common Pleas, Case No. 96CR-10-087;

(b)     State v. David Lovejoy; Madison County Common Pleas, Case No. 97CR-06-043;

(c)     State v. Phillip Wierzack or Wierzgac; Madison County Common Pleas, Case No. 97CR-06-044;

(d)     State v. James R. Bowling; Madison County Common Pleas, Case No. 97CR-06-045;

(e)     State v. William Vandersommen; Madison County Common Pleas, Case No. 97CR-06-046;

(2)   A complete copy of the individual juror's notes taken during the trial of John Stojetz;

(3)   A complete copy of the individual juror's notes taken during the trials of Jerry W. Bishop and James Bowling.

## 2. Forensic, Trace, and Physical Evidence

A.     (1)   An inventory of all items of evidence located at, near or from the scene of the murder of Damico Watkins, including, but not

limited to, any and all trace evidence, weapons, blood samples, clothing, shoe prints or shoe impressions, finger prints or finger impressions, palm prints or palm impressions, writings, chalk outlines, line of sight creations or recreations, and any and all other physical evidence seized or seized and discarded wheresoever situated;

(2)    Access to all items of evidence located at, near or from the scene of the murder of Damico Watkins, including, but not limited to, any and all trace evidence, weapons, blood samples, clothing, shoe prints or shoe impressions, finger prints or finger impressions, palm prints or palm impressions, writings, chalk outlines, line of sight creations or recreations, and any and all other physical evidence seized or seized and discarded wheresoever situated.

B.    (1)    An inventory of all audio recordings, video recordings, or combined audio/video recordings, photographs, diagrams, or notes depicting or describing the crime scene, the body of Damico Watkins, the recovery of the body of Damico Watkins, the gathering of physical, forensic or trace evidence during or after the investigation into the death of Damico Watkins;

(2)    Copies of all audio recordings, video recordings, or combined audio/video recordings of depicting or describing the crime scene, the body of Damico Watkins, the recovery of the body of Damico Watkins, the gathering of physical, forensic, or trace evidence during or after the investigation into the death of Damico Watkins.

### 3.  Statements and Reports

A.    (1)    An inventory of all interviews, interrogations, questioning, inquiries, or statements made, taken or otherwise obtained during of since the investigation or prosecutions of John Stojetz, his co-defendants, accomplices or others for the death of Damico Watkins, said inventory to include but not limited to, all statements of witnesses, investigators or employees of MaCI, the OSHP, the BCII, or the ODRC, or other state, local or federal law enforcement agencies, and whether fact witnesses, suspects, defendants, codefendants, accomplices or others;

(2)    Copies of all interviews, interrogations, questioning, inquiries, or statements made, taken or otherwise obtained during or since the investigation or prosecutions of John Stojetz, his co-

11

defendants, accomplices or others for the death of Damico Watkins, said copies to include but not limited to, all statements of witnesses, investigators or employees of the MaCI, the OSHP, the BCII, or the ODRC, or other state, local or federal law enforcement agencies, and whether fact witnesses, suspects, defendants, codefendants, accomplices or others.

B.     (1)     An inventory of all reports of all investigators, law enforcement agents, employees, staff, or personnel of MaCI, the OSHP, the BCII, or the ODRC, or other law enforcement authorities, concerning the investigation into the death of Damico Watkins, and whether contained in notes, raw notes, summaries, hand writings, typed writings, audio recordings, video recordings or combined audio / video recordings, letters, emails or email attachments, computer discs or other electronic format or any other form;

    (2)     Copies of all reports of all investigators, law enforcement agents, employees, staff, or personnel of MaCI, the OSHP, the BCII, or the ODRC, or other law enforcement authorities, concerning the investigation into the death of Damico Watkins, and whether contained in notes, raw notes, summaries, hand writings, typed writings, audio recordings, video recordings or combined audio / video recordings, letters, emails or email attachments, computer discs or other electronic format or any other form.

### 4. Depositions

A.     The prosecutors who prosecuted or otherwise participated in the prosecution of this case, including but not limited to, Madison County Prosecutor Stephen J. Pronai and Madison County Assistant Prosecutor Daniel A. Huston;

B.     Madison County Court of Common Pleas, Criminal Court Clerk, regarding the preservation, loss or destruction of exhibits and physical evidence in this case;

C.     ODRC or Madison Correctional Institution, Officers and Staff:

    (1)     Corrections Officer Michael Browning;
    (2)     Corrections Officer John Vanover;
    (3)     Administrative Assistant Walt Ashbridge;
    (4)     former Lieutenant / Corrections Officer Gerald Nelson;

      (5)    Matthew Robert Meyer

D.     Ohio State Highway Patrol Investigators:

      (1)    Trooper Alan Wheeler;
      (2)    Trooper Ron Nichols;
      (3)    Trooper Rick Downey;
      (4)    Criminalist Jeffrey William Turnau;
      (5)    Sergeant Timothy Tuttle;

E.     Petitioner's Attorneys:

      (1)    Attorney James A. Doughty;
      (2)    Attorney Jon A. Doughty;
      (3)    Attorney John J. Gideon;
      (4)    Attorney Cordelia a. Glenn;

F.     ODRC and MaCI Inmates or Former Inmates:

      (1)    John Wierzgac; (Phillip?)
      (2)    James R. Bowling;
      (3)    Jerry W. Bishop;
      (4)    William Vandersommen;
      (5)    David Hicks;
      (6)    David Lovejoy;
      (7)    Douglas Haggerty;
      (8)    Prentiss Williams;
      (9)    John McDermott;
      (10)  Alfonso J. Greer;
      (11)  Andre Wright;
      (12)  Sidney Taylor;
      (13)  Roman D. Ward;
      (14)  Brandon Hill.

Further depositions may be necessary as discovery continues.

(Doc. # 46, at 2-13.)

### III.  Applicable Law

The discovery processes contained in the Federal Rules of Civil Procedure do not

automatically apply in habeas corpus actions.  "A habeas petitioner, unlike the usual civil litigant

in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  In *Harris v. Nelson*, 394 U.S. 286, 295 (1969), the United States Supreme Court held that the "broad discovery provisions" of the Federal Rules of Civil Procedure did not apply in habeas corpus proceedings.  As a result of *Harris*, Rule 6(a) of the Rules Governing Section 2254 Cases In United States District Courts was promulgated in 1976 to establish a "good cause" standard for discovery.  Specifically, Rule 6(a) provides:

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

Under this "good cause" standard, a district court should grant leave to conduct discovery in habeas corpus proceedings only "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are more fully developed, be able to demonstrate that he is ... entitled to relief....'" *Bracy*, 520 U.S. at 908-909 (quoting *Harris*, 394 U.S. at 300).  *See also Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001).

The discovery that petitioner seeks relates primarily to three of his habeas claims, *i.e.*, actual innocence, ineffective assistance of counsel, and the withholding by prosecutors of material, exculpatory evidence in violation of his due process rights as set forth in *Brady v. Maryland*, 373 U.S. 83, 87 (1963).[1]  Petitioner argues that he is actually innocent of the charge of aggravated murder, as well as of a charge that warrants the imposition of the death penalty. He raises his actual innocence claim both as a free-standing constitutional claim and a "gateway"

---

[1]  Petitioner also makes passing references to a claim that his death sentence is invalid and arbitrary (Doc. # 46, at 23), to claims of violations of due process (*Id.*), and to allegations that the Madison County Clerk of Courts may have destroyed various items of evidence from this case before the matter arrived in federal court (*Id.*). Further, petitioner attempts in his reply to establish a nexus between his discovery requests and nearly all of his claims; but that nexus is tenuous at best.

claim allowing the Court to review the merits of claims that would otherwise be barred by procedural default.  He argues that he is actually innocent because he never intended for Watkins to be killed, never ordered anyone to kill Watkins, and never delivered any of the knife wounds that killed Watkins.

The essence of petitioner's claim of ineffective assistance of counsel, as it relates to the instant discovery requests, is that counsel took no steps to investigate or support the defense that they promised at petitioner's trial to present.  (Petition, Doc. # 14-3, at ¶¶ 95-97.)  According to petitioner, attorneys Jon and James Doughty planned to defend petitioner on the theory that his involvement in the murder of Watkins was the direct result of petitioner's belief that Watkins had attacked another juvenile inmate (Doug Haggerty), whom petitioner had sought to protect, and had announced an intent to attack and kill petitioner and other members of the Aryan Brotherhood gang to which petitioner belonged, and that petitioner never intended for Watkins or anyone else to be killed.  (*Id*., at ¶ 96.)  "Despite the clear intent to defend on these theories counsel took no steps to investigate these theories or to present any evidence to support this defense."  (*Id*., at ¶ 97.)  Petitioner asserts that counsel abdicated their duty to investigate and present a defense by relying entirely on the evidence that the prosecution provided during discovery, failing to conduct any investigation of their own, and neglecting to interview any of the state's witnesses or witnesses that petitioner asked them to interview.  This failure, according to petitioner, deprived him of witnesses who would have directly supported trial counsel's claimed defense.

For purposes of the instant discovery requests, petitioner argues that the prosecution violated his due process rights as set forth in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), by

misrepresenting the facts as to petitioner's motivation for, and role in, the incident and then withholding evidence in its possession that would have proved the falsehood of its case. (Petition, Doc. # 14-12, at ¶ 607.) Petitioner argues that it was revealed during state postconviction proceedings that the prosecution provided to petitioner's defense counsel an edited version of the 22-page report of Ohio State Highway Patrol Sergeant Downey–*i.e.*, the state's official document of evidence, witnesses, and investigative results–and that the 15-page version that defense counsel received omitted references to statements by juvenile inmates Sidney Taylor, Brandon Hill, and Roman Ward that would have exculpated petitioner. (Petition, Doc. # 14-12, at ¶¶ 609-618.) Petitioner further argues that the stated reasons for providing the edited version, *i.e.*, security concerns and protecting attorney work product, were "shams" because the prosecution subsequently provided the full, unedited version of Sergeant Downey's report to petitioner's co-defendants (Bowling and Bishop) before their trials. (*Id.*, at ¶¶ 612-613.) Consistent throughout petitioner's memorandum in support of his discovery motion is his assertion that the prosecution failed to provide discoverable evidence that was inconsistent with its theory of the case and exculpatory to petitioner.

In order to determine whether petitioner is entitled to conduct discovery on his claims, the Court initially must identify the essential elements of his claims. *See Bracy*, 520 U.S. at 904. Assuming without deciding that a freestanding claim of actual innocence is cognizable in federal habeas corpus, it appears that a petitioner would have to "convince a court that new facts unquestionably establish" his innocence. *Hartman v. Bagley*, 333 F. Supp.2d 632, 652 (N.D. Ohio 2004), citing *Schlup v. Delo*, 513 U.S. 298, 316 (1995). That is, a petitioner would have to present a "truly persuasive demonstration of 'actual innocence,'" and the "threshold showing for

such an assumed right would necessarily be extraordinarily high." *Herrera v. Collins*, 506 U.S. 390, 417 (1993); *see also House v. Bell*, 126 S.Ct. 2064, 2086-87 (2006).[2]  Petitioner need not prove these elements in order to justify discovery; rather, he must show that, if the facts are developed through the discovery he seeks, he could prove a constitutional violation and would be entitled to relief. *See Harris, supra*, 394 U.S. at 299.

As for the essential elements of petitioner's ineffective assistance of counsel claims, the right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  With respect to the first prong of the *Strickland* test, this Court notes that, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689.

To establish the second prong of the *Strickland* test, *i.e.*, prejudice, a petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id*. at 694.  "A reasonable probability is a probability

---

[2]        Several courts have hinted that this dictum in *Herrera* left open the possibility of entertaining in federal habeas corpus a freestanding claim of actual innocence even following a state trial otherwise free of constitutional error.  *See, e.g., Hartman v. Bagley, supra*, 333 F.Supp.2d at 653; *Madrigal v. Bagley*, 276 F.Supp.2d 744, 758 (N.D. Ohio 2003), *aff'd* 413 F.3d 548 (6th Cir. 2005).

sufficient to undermine confidence in the outcome." *Id*.  Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate the ineffective assistance of counsel, should the Court determine that Petitioner has failed to satisfy one prong, it need not consider the other.  *Id*. at 697.

Inherent in counsel's responsibilities is the duty to investigate.  "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland, supra*, 466 U.S. at 691; *Sims v. Livesay*, 970 F.2d 1575, 1580-81 (6th Cir. 1992); *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994)(failure to investigate, especially as to key evidence, must be supported by a reasoned and deliberate determination that investigation was not warranted); *Workman v. Tate*, 957 F.2d 1339, 1345-46 (6th Cir. 1992)(reasonable investigation was lacking, so counsel's performance was deficient).

Regarding the essential elements of a *Brady* claim, the rule in *Brady* requires the government "to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment."  *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987).  In *Giglio v. United States*, 405 U.S. 150, 154 (1972), the Supreme Court went on to hold that the *Brady* rule includes evidence that might impeach the credibility of state witnesses.  Materiality is determined by asking "whether the *Brady* violation undermines confidence in the verdict, because there is a reasonable probability that there would have been a different result had the evidence been disclosed."  *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).  Again, petitioner need not prove these elements; rather, he must show that if the facts are developed through the discovery he seeks, he could prove a *Brady* violation and would be entitled to relief. *See Harris, supra*, 394 U.S. at 299.

18

The letter and spirit of Habeas Corpus Rule 6 and *Bracy* call for discovery requests to be specific and limited.  The instant discovery requests cannot be characterized as either.  In keeping with the well settled principle that habeas petitioners are not entitled to go on a fishing expedition in search of damaging evidence, the "good cause" standard of Rule 6 requires petitioner to at least attempt to identify what he expects to uncover through his discovery requests.  *See Williams v. Bagley*, 380 F.3d 932, 976 (6th Cir. 2004).  With respect to *Brady* claims and proving that discovery is warranted thereon, the Court is mindful of the difficulties inherent in describing what facts the petitioner hopes to uncover or develop from materials that were never disclosed in the first place.  But these difficulties do not relieve petitioner of his duty to state with some specificity what he intends to find or prove from his discovery requests.  Pleading a claim under *Brady* does not automatically entitle a petitioner to unfettered, unqualified access to the government's files in the hopes that he will find something useful.  *See, e.g., Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) (habeas corpus "was never meant to be a fishing expedition for habeas petitioners to 'explore their case in search of its existence.'" (quoting *Aubut v. State of Maine*, 431 F.2d 688, 689 (1st Cir. 1970)).

It also bears mentioning that whether and to what extent petitioner is entitle to federal habeas corpus discovery might be, contrary to what petitioner asserts in his reply memorandum (Doc. # 55, at 3), informed by the diligence that he exercised in developing the facts underlying his constitutional claims in the state courts.  In *Holland v. Jackson*, 542 U.S. 649, 653 (2004), the Supreme Court held that the restrictions on factual development set forth in 28 U.S.C. § 2254(e)(2) apply when a petitioner seeks to present new evidence not considered by the state courts, whether he seeks to present that new evidence through an evidentiary hearing or

expansion of the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases.[3]  This

Court is aware of at least one case in which *Holland*'s holding was extended to prohibit a

discovery request that appeared to be fashioned as "an end run around the restrictions of Rule 7

as interpreted by *Holland v. Jackson*, 542 U.S. 649 (2004)."  *Stallings v. Bagley*, Case No. 505-

CV-722, 2007 WL 437888 (N.D. Ohio Feb. 6, 2007), at *2.  Thus, in determining whether

petitioner has satisfied the "good cause" standard for discovery, this Court must keep in mind

that–to the extent that petitioner seeks to introduce new evidence to demonstrate that he is

entitled to relief on his constitutional claims, *i.e.*, to demonstrate that the state courts' decisions

rejecting those claims were contrary to or involved unreasonable applications of clearly

established Federal law as determined by the Supreme Court, 28 U.S.C. § 2254(d)(1)–he must

demonstrate that the failure to develop that new evidence in the state courts was not the result of

his failure to exercise due diligence.  *See, e.g., Williams (Michael) v. Taylor*, 529 U.S. 420, 430-

32 (2000).  To the extent, however, that petitioner seeks to present new evidence for purposes

other than demonstrating that he is entitled to relief on his constitutional claims, such as

attempting to satisfy the cause-and-prejudice or "actual innocence" exceptions to procedural

default, then presumably petitioner would not be required to demonstrate that he exercised due

---

[3]     Section 2254(e)(2) of Title 28 of the United States Code provides:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–

> (A) the claim relies on–
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

diligence in attempting to develop the new evidence in state court proceedings. *See Cristin v. Brennan*, 281 F.3d 404, 417 n.14 (3rd Cir. 2002) (suggesting that the standard adopted in § 2254(e)(2) does not apply to evidentiary hearings on whether a petitioner can establish an excuse for an earlier procedural default); *see also Boyko v. Parke*, 259 F.3d 781, 790 (7th Cir. 2001) (finding that § 2254(e)(2) should not be applied when expansion of the record is sought for purposes other than introducing new evidence on the merits of a claim).

With all of these principles in mind, the Court will examine each of petitioner's discovery requests.

## IV. Discussion

### A. Records and Documents

1. **<u>Files concerning the death of Damico Watkins.</u>** Petitioner seeks an inventory of the files, an inventory of the contents of those files, and a copy of the complete files relating to the death of Damico Watkins and/or the prosecutions of petitioner and any others for that death, whether a part of criminal proceedings, internal security, disciplinary, or other review, civil proceedings, or other purposes. He seeks such records from Madison Correctional Institute (MaCI), the Ohio State Highway Patrol (OHSP), the Ohio Bureau of Criminal Identification and Investigation (BCII), the Ohio Department of Rehabilitation and Correction (ODRC), and the Franklin County and Madison County coroners' offices.

Petitioner has not demonstrated "good cause" for these discovery requests. One reason that petitioner advances in his memorandum in support of his discovery requests in this regard is to dispute the State's theory that petitioner carried a particular knife that delivered some of the fatal wounds. Petitioner argues that it was shown during his postconviction proceedings that the

knife in question was given to a codefendant before the lethal blows were struck.  The Court disagrees.  Evidence developed in postconviction on this issue was, at best, conflicting.  Further, even assuming that were not the case, he fails to establish a suitable nexus between that contention and the sweeping nature of his discovery requests.  Codefendant William Vandersommen testified in a postconviction deposition that he had the longest knife when the group entered the Adams A unit and that petitioner took it from him only after he had stabbed the victim a few times in the victim's cell.  (Tr. Vol. IX, Tab 3, at 43-46.)  Codefendant Philip Wierzgac said in a statement that he provided pursuant to his own plea, as well as during testimony in the trial of codefendant James Bowling, that petitioner had the longest knife and that he had had it from the outset, before the group entered the Adams A unit.  (App.Vol. IV, at 241-43, 365-66.)  Further, C.O. Michael Browning testified at the postconviction hearing that he was certain that petitioner held up a knife to him and demanded the keys to the cells in Adams A unit.  (Tr.Vol. VIII, Tab 2, at 6.)  In short, this particular contention by petitioner does not provide good cause for petitioner's expansive discovery requests.

Petitioner also offers in his reply memorandum as a justification for these materials that "[i]t is doubtful that any one investigator or prosecutor in this matter has reviewed *all* of the records and documents from *all* of the agencies involved."  (Doc. # 55, at 7.)  Even assuming that is true, it does not establish good cause for petitioner to do so now.  Petitioner must provide a specific justification for the materials that he seeks.  *See Williams v. Bagley, supra*, 380 F.3d at 974 (holding that Rule 6 does not permit fishing expeditions based on conclusory allegations).

Petitioner notes in his memorandum in support and in his reply memorandum that the OSHP was involved in taking statements from numerous witnesses, including MaCI personnel

and inmates.  Petitioner speculates that some statements that may have exculpated him were not turned over to defense counsel during pretrial discovery.  (Doc. # 46, at 5.)  In his memorandum in support, petitioner not only points to statements by juvenile inmates Roman Ward and Brandon Hill, but also asserts that the State had in its possession evidence demonstrating the guilt of codefendants William Vandersommen and Jerry Bishop.  However, petitioner offers no basis for concluding that the statements by Ward and Hill were not provided to defense counsel during pretrial discovery; moreover, a review of those statements does not reveal them to be as exculpating as petitioner suggests.  Further, evidence developed during state postconviction proceedings, contrary to petitioner's assertion, did not conclusively establish the guilt of Vandersommen and Bishop, and the concomitant innocence of petitioner.

It is true that Roman Ward could not say that he ever saw petitioner stabbing the victim, but he did say that petitioner had the biggest knife in his hand and was shouting out orders to the white inmates who had stormed the Adams A unit.  (App.Vol. IV, at 302.)  It is also true that Brandon Hill stated that he saw only codefendant Bishop chase and stab the victim; but Hill also stated that he deliberately looked away during much of the incident.  (App.Vol. IV, at 74, 140.)  Notwithstanding the inculpating statements by Vandersommen, set forth in an affidavit and deposition that petitioner submitted in postconviction, and the evidence of Bishop's guilt from Bishop's trial, which petitioner submitted in postconviction, there was still more than sufficient evidence in postconviction of petitioner's role in the murder.  As an example, the trial court summarized the statements of thirty juvenile inmate witnesses who were able to describe petitioner's role in the incident; the trial court also noted that four other juvenile inmate witnesses identified petitioner by description, although not by name, as having participated in the

23

murder.  (App.Vol. V, at 204-210.)

Ohio State Highway Patrol lead investigator, Trooper Rick Downey, testified during petitioner's postconviction hearing that transcripts of all interviews of the inmates that were conducted after the incident had been provided to defense counsel.  (Tr.Vol.. VIII, Tab 1, at 258.)  The trial court undertook a painstaking review of this "unprecedented" open discovery that the State provided (App.Vol. V, at 265) and noted, among other things, that all of the inmate witnesses' statements had been provided to defense counsel.  (App.Vol. V, at 217.)  Petitioner makes much of the fact that a comparison of Trooper Downey's full investigative report with the redacted report that was provided to defense counsel during pretrial discovery reveals that references to certain inmates' statements had been redacted, allegedly for security reasons, (Tr.Vol.. VIII, at 262-273).  This fact, however, does not change or diminish the fact that all of the inmate witness statements themselves had been provided to defense counsel.  There is simply no reason to conclude from this particular contention by petitioner that the OSHP withheld exculpatory evidence from petitioner's defense counsel.

Petitioner suggests quite generally in his reply memorandum that the materials he seeks will demonstrate conflicts in the evidence as found by investigators but not revealed to petitioner's defense counsel for use at trial.  (Doc. # 55, at 7.)  Petitioner fails to elaborate on the nature of the allegedly conflicting evidence, but the Court would note, as did the trial court in its decision rejecting petitioner's postconviction claims, (App.Vol. V, at 273), that because of the nature of the incident and the limited view that the juvenile inmate witnesses had of the incident as it was unfolding, it is not at all surprising that the inmate witnesses would have provided conflicting or fragmented accounts of what took place.  In light of all of the statements, incident

24

reports, photographs, and other evidence that were provided during pretrial discovery, petitioner has not established good cause to believe that his current discovery requests "will demonstrate the conflicting evidence found by investigators but not revealed to Petitioner's defense counsel for use at trial." (Doc. # 55, at 7.)

With respect to the request for materials from BCII, petitioner states in his memorandum in support that, because neither his trial counsel nor his postconviction counsel specifically requested all relevant investigative and laboratory records, petitioner is now entitled to these records in federal habeas corpus. Petitioner is mistaken. Petitioner opines that the requested records from BCII will enable him to demonstrate that the offense did not occur as the prosecution had claimed, but petitioner offers no basis for that conclusion. Moreover, the essentially conflicting versions of how the offense occurred are found almost exclusively in witness statements collected primarily by OSHP investigators. Thus, petitioner has not offered good cause to justify investigative and laboratory records from BCII. *See, e.g., Sherman v. McDaniel*, 333 F. Supp. 2d 960, 967 (D. Nevada 2004) (rejecting as insufficient to establish good cause a "generic claim" that trial counsel conducted inadequate discovery and independent investigation).

Petitioner also requests the files of the Madison County and Franklin County coroners' offices. He supports this request by asserting that the hit and miss methods employed by his trial and postconviction attorneys, as well as the refusal of the state courts to grant him funds for a forensic defense pathologist, offer no guarantee that he received all of the materials sought by him in an effort to fully investigate the circumstances of the death of the victim. In his reply memorandum, petitioner expands that he is entitled to the files in order to attack a key

component of the state's case against him–namely, that he allegedly carried and used the weapon identified as causing the fatal wounds. None of these assertions establish good cause for the files that petitioner now seeks. He offers no specific justification for these materials or any reason to believe that they would provide evidence, or would lead to evidence, that would bolster his constitutional claims. The evidence that was produced at trial, and subsequently explored during state postconviction proceedings, concerning whether petitioner carried the knife that caused some of the fatal wounds consisted of eyewitness accounts, not forensic evidence. Petitioner has not demonstrated, and it is not otherwise apparent to the Court, how the files of the Madison County Coroner and Franklin County Coroner are necessary or warranted to enable him to attack this component of the state's case against him.

      **2. Records concerning gang activities at MaCI.** Petitioner seeks records concerning the following individuals' association in or with gangs or gang activities while at MaCI or elsewhere: Damico Watkins, Petitioner Stojetz, Jerry Bishop, David Lovejoy, Phillip Wierzgac, James Bowling, and William Vandersommen. He seeks such records from MaCI, OSHP, BCII, and ODRC.

      Petitioner has not demonstrated good cause for these materials because he has not explained what, if anything, he hopes to prove that is not already sufficiently reflected in the record. Petitioner explains in his memorandum in support:

> Evidence of the gang activities of Watkins would demonstrate the high level of hostility of his gang, The Folks, toward members of the Aryan Brotherhood and, in particular, the petitioner. This evidence will demonstrate the predicament in which the petitioner found himself, substantiate the plan to respond to lethal threats by Watkins by "fighting" Watkins, and Stojetz's lack of intention to cause Watkins' death.

(Doc. # 46, at 17.) Petitioner further explains in his reply memorandum that the events leading

26

up to the death of Damico Watkins were set in motion by Watkins himself and his gang at MaCI, and that the murder of Watkins was the direct result of the unwillingness of the MaCI staff and ODRC to address the violence at MaCI and other prisons. Having thoroughly reviewed the record in this case, the Court is not persuaded that the materials that petitioner seeks in this regard are necessary or that the facts he seeks to prove are in dispute. The evidence produced at trial, along with evidence developed during petitioner's state postconviction proceedings, sufficiently established that Watkins had some affiliation or connection with a gang of black juvenile inmates at MaCI and that there was a considerable amount of hostility between that group and the Aryan Brotherhood in general and petitioner in particular.

Both deputy Warden Mark Saunders and Administrative Assistant Walt Ashbridge testified at petitioner's trial that it was learned after the incident that Watkins was a member of or associated with "The Folks." (Tr.Vol. V, at 659, 683-84.) Juvenile inmate Alfonso Greer, on the other hand, testified that he was not aware of Watkins's association with a gang. (Tr.Vol. IV, at 592.) Administrative Assistant Walt Ashbridge also presented testimony at petitioner's trial about the presence and monitoring of gangs at MaCI. (Tr.Vol. V, at 677-685.)

Petitioner was able to develop and present considerable testimony and evidence during his state postconviction proceedings in support of his contentions that Watkins was affiliated or associated with a gang of other black juvenile inmates, that there was tension between that gang and petitioner's own Aryan Brotherhood gang, that administrators at MaCI were unable or unwilling to confront the juvenile gangs, and that petitioner had intended only to fight Watkins on the day of the incident in order to answer what petitioner had perceived as lethal threats from Watkins and other black juvenile inmates with whom he associated. The Court will not attempt

27

to summarize all of that evidence and testimony but, as an example, petitioner stated as much in one of his postconviction affidavits as well as his postconviction testimony. (App.Vol. IV, at 31-33; Tr.Vol.VIII, Tab 1, at 289-398.) Kevin Fulkerson recounted in an affidavit and a deposition that, on the morning of the incident, he had overheard (and relayed to petitioner) juvenile inmates Andre Wright and Damico Watkins attempting to recruit other black juvenile inmates to join them in attacking petitioner and other members of the Aryan Brotherhood at or shortly after lunch time. (App.Vol. IV, at 53-54; Tr.Vol. IX, Tab 4, at 24-31.) In his postconviction proceedings, petitioner offered a transcript of the testimony of Administrative Assistant Walt Ashbridge at codefendant Bishop's trial, concerning the presence and monitoring of gangs at MaCI, (App.Vol. IV, at 124-133). Petitioner called Ashbridge during his postconviction hearing again to question him about gang activities at MaCI, (Tr.Vol. VIII, Tab 1, at 276-288). Corrections Officers Matthew Robert Meyer and John Vanover also provided testimony during petitioner's postconviction hearing about gang presence at MaCI. Codefendants Bowling and Vandersommen stated in affidavits and depositions that, among other things, the "plan" that day was only for petitioner to fight Watkins and to have the others with him guard against other inmates or correction officers interfering with the fight. (App.Vol. IV, at 40, 56; Tr.Vol. IX, Tab 1 and Tab 3.) Also presented during petitioner's postconviction proceedings was evidence that petitioner's codefendants/accomplices were members of, or at least associated with, the Aryan Brotherhood.

Without making any factual findings at this point, the Court is satisfied that the record regarding the gang activities and related topics is sufficiently developed. The Court is also satisfied that petitioner has not advanced a sufficient justification for the records that he seeks.

*See, e.g., Hughes v. Phillips*, 457 F. Supp. 2d 343, 366 (S.D.N.Y. 2006) ("'Good cause' certainly cannot lie when the predicate facts were already developed in State proceedings....").

    **3.  Records concerning juvenile inmate Doug Haggerty.**  At petitioner's trial and during his state postconviction proceedings there was evidence purporting to establish that petitioner and his accomplices stormed the Adams A unit that day to avenge an attack on Doug Haggerty the night before, allegedly at the hands of one or several black juvenile inmates, one of whom may have been Damico Watkins.  Haggerty was a white juvenile inmate whose father had allegedly asked petitioner to protect.  Petitioner seeks records concerning Haggerty's affiliation with gangs or gang activities at MaCI or elsewhere, as well as records concerning security issues, altercations, fights, assaults, or other incidents involving Haggerty at MaCI or elsewhere. Petitioner does not advance a single justification for the discovery materials that he seeks, and none is apparent to the Court.  The records that petitioner seeks concerning Doug Haggerty would not, in this Court's view, contain any information relevant to petitioner's constitutional claims and petitioner has not advanced a single reason to believe otherwise.  *See Stanford v. Parker, supra*, 266 F.3d at  460 ("The burden of demonstrating the materiality of information requested is on the moving party.").

    **4.  Personnel records of members of MaCI staff.**  Petitioner makes a sweeping request for personnel records of MaCI staff.  He requests a complete list of all MaCI staff in April 1996; the complete personnel files of twenty-two named staff members, (Doc. # 46, at 3), for the time period 1993-1998; and all time records, duty roster sheets, entrance and exit records, and sign in sheets of all staff on duty at MaCI for the time period of April 20 through April 30, 1996.  He seeks these records from MaCI and, in part, from ODRC.

Petitioner fails to offer a single justification for these requests in his memorandum in support. In his reply memorandum, he asserts that the records will help him establish that many of the staff members who were *not* called by the State to testify were in a position to observe his actions leading up to, during, and after the incident, and that many of the staff members who *were* called by the State could not have been in a position to observe or know about the matters to which they testified. (Doc. # 55, at 8.) Petitioner does not advance a shred of evidence to support this supposition. Consequently, his request for these records strikes this Court as the classic "fishing expedition" that is not permitted in federal habeas discovery. *See Williams v. Bagley, supra,* 380 F.3d at 974 ("'Conclusory allegations are not enough to warrant discovery under [Rule 6]; the petitioner must set forth specific allegations of fact.'" (quoting *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994)).

**5. <u>Records concerning proceedings against codefendants/accomplices.</u>** Petitioner requests from MaCI and ODRC records concerning the security status or disciplinary reviews of, or Rules Infraction Board proceedings against, petitioner's codefendants/accomplices–Jerry Bishop, David Lovejoy, Phillip Wierzgac, James R. Bowling, and William Vandersommen–held any time on or after April 26, 1996. In neither his memorandum in support nor his reply memorandum does petitioner advance a single justification for such materials, and none is otherwise apparent to the Court. *See, e.g., Stanford v. Parker, supra*, 266 F.3d at 460 ("The burden of demonstrating the materiality of information requested is on the moving party.").

**6. <u>Inmates in Adams A Unit.</u>** Petitioner also requests from MaCI and ODRC a complete list of every inmate in the Adams A unit during the month of April 1996, including race, date of birth, social security number, ODRC inmate number, cell number, known or

suspected gang affiliation, and current ODRC status.  In neither his memorandum in support nor

his reply memorandum does petitioner advance a single justification for such materials, and none

is otherwise apparent to the Court.  Investigators interviewed every juvenile inmate witness who

was physically present in the Adams A unit at the time of the incident.  Authorities provided

transcripts and/or summaries of those interviews to petitioner's defense attorneys during pretrial

discovery and petitioner has not advanced a reasonable basis for concluding otherwise.  Further,

it appears that a list of every juvenile inmate who was physically present in Adams A during the

incident was submitted as an exhibit during petitioner's postconviction hearing, (App.Vol. VI, at

61), and that the same was in fact provided to petitioner's defense attorneys during pretrial

discovery on February 4, 1997, (App.Vol. V, at 203).  That being so, this Court can conceive of

no justification for this discovery request.  *See, e.g., Stanford v. Parker, supra*, 266 F.3d at 460

("The burden of demonstrating the materiality of information requested is on the moving

party.").

    7.  **All prosecution and governmental files.**  Petitioner makes a sweeping request for

materials from the Madison County prosecuting attorney and other state, local, and federal law

enforcement agencies.  First, petitioner requests the complete records and files of the Madison

County Prosecuting Attorney regarding the investigation of the death of Damico Watkins and/or

the prosecutions of petitioner and his codefendants/accomplices.  From "Other State, Local,

[and] Federal Law Enforcement Authorities," petitioner requests all inventories and lists of

evidence, all inventories and lists of statements stemming from the investigation of the death of

Damico Watkins and/or the prosecution of petitioner and his codefendants/accomplices, and an

inventory and complete copy of any papers, evidence, or other materials pertaining to any legal

action brought by or on behalf of the estate of Damico Watkins.

In support of this request, petitioner asserts in his memorandum in support that he demanded from the inception of his case a thorough examination of all evidence and leads to evidence, and that "his trial attorneys gave short shrift to his demands." (Doc. # 46, at 20.) Petitioner goes on to argue that "events subsequent to his trial have proven his suspicions of withholding of evidence prescient," and petitioner provides as an example "the submission of statements by codefendants Vandersommen and Bishop admitting that the plan was to 'fight Watkins' and not kill him, but that they 'went berserk' and stabbed him to death, contrary to the understanding of all involved." (Doc. # 46, at 21.) The Court is not persuaded that petitioner's argument satisfies the "good cause" standard for the sweeping discovery request set forth above.

The state trial court issued a comprehensive decision in excess of one-hundred pages addressing petitioner's postconviction claims in which, among other things, it recounted in painstaking detail every piece of evidence that the prosecution turned over to petitioner's defense attorneys during pretrial discovery. (App.Vol. V, at 198-212.) The trial court stated that the discovery provided by the prosecution was far broader and in greater detail than what is contemplated by the rules of criminal procedure, going so far as to say, "I am unaware of any case in which the State provided a complete summary of accounts of the event from every single witness. The State's open discovery was unprecedented." (*Id.*, at 265.) Petitioner's suggestion that statements by codefendants Vandersommen and Bishop provide examples of withholding of evidence by the prosecution is specious. Neither was willing to speak to investigators nor did either provide statements following the incident. In postconviction, petitioner submitted the affidavit of Vandersommen dated February 23, 1998 (App.Vol. IV, at 40), and the deposition of

Vandersommen that took place on September 8, 1999 (Tr.Vol. VIII, at Tab 3).  It does not appear that petitioner submitted in his postconviction proceedings any affidavit, testimony, or statement by Bishop.  Petitioner did submit as an exhibit a letter by Bishop to an individual named Kathy, dated August 30, 1996, stating, among other things, "10 niggers jump one of my friends and was going to jump me, so I got him first."  (App.Vol. IV, at 47.)  Petitioner does not explain, and it is not apparent to the Court, how the prosecution could have improperly withheld from petitioner at his original trial in April 1997 a statement that post-dated petitioner's trial and was generated through petitioner's own initiative.  That being so, petitioner's argument in this regard fails to establish good cause for his request for records from the prosecuting attorney and other law enforcement agencies.  The Court recognizes that neither *Bracy* nor Rule 6 requires a petitioner to plead specific facts entitling him to habeas relief in order to obtain leave to conduct discovery.  But the discovery that the Supreme Court authorized in *Bracy* was specific and limited, even if the petitioner's theory, at that point, was not supported by solid evidence.  *Bracy v. Gramley, supra*, 520 U.S. at 908-909.  The same simply cannot be said of petitioner's instant request for the records of the prosecuting attorney and other law enforcement agencies.

    **8.  <u>Court records.</u>**  Petitioner's next discovery request concerns court records not only from his case but also from those of all of his codefendants/accomplices.  Petitioner requests "[t]he complete trial file, including but not limited to transcripts, pleadings, motions, evidence, and other materials" of the proceedings arising from the death of Damico Watkins against each of his codefendants/accomplices, to wit: Jerry Bishop, David Lovejoy, Phillip Wierzgac, James R. Bowling, and William Vandersommen.  In addition, petitioner requests a complete copy of each individual juror's notes taken during his trial, as well as during the trials of Jerry Bishop

and James Bowling.

In his memorandum in support, the only justification that petitioner sets forth for this request was the same one that he advanced for his request for records from the prosecuting attorney and other law enforcement agencies–namely, that statements by Vandersommen and Bishop submitted by petitioner during postconviction offers support for the contention that the State withheld evidence.  (Doc. # 46, at 7-8.)  The Court has already considered and rejected that argument as insufficient to establish "good cause," especially when offered for such broad discovery requests.

Beyond that argument, petitioner explains in his reply memorandum that he has raised claims challenging not only his counsel's performance, but also the trial court's instructions and explanations, during the general and death penalty questioning of the venire.  Petitioner then explains that the court records he seeks will assist him in "demonstrat[ing] that the jurors who sat in judgment of him had a misconception of his defense–if any had actually been presented, confusion over what to expect in evidence and mitigation at trial, a misconception of the appropriate circumstances in which a death verdict might be returned, confusion over the burden of proof, and evidence of the individual juror's bias, prejudice and misunderstanding of the burdens of proof, and upon whom those burdens actually rested as a matter of law."  (Doc. # 55, at 10.)  Petitioner has not established any nexus between this stated purpose and the overly broad request for every shred of paper and every piece of evidence connected to the cases against every one of his codefendants/accomplices.  Thus, his request for those court files is unwarranted. Similarly, petitioner has not shown, and it is not otherwise apparent to the Court, how individual juror's notes from the trials of Bishop and Bowling would shed any light on petitioner's claims

challenging the conduct of petitioner's defense counsel and the trial court during the voir dire in petitioner's trial.

As for petitioner's request for each individual juror's notes from his own trial, petitioner's counsel's performance and the trial court's instructions and explanations are of record and available to petitioner without the discovery he seeks. He has advanced no reason whatsoever to believe that the individual juror's notes from his own trial might contain any information that would assist him in demonstrating that he is entitled to relief on his third claim for relief or in demonstrating cause and prejudice to excuse those parts of his third claim for relief that are subject to procedural default. It bears reminding that habeas corpus is not a proceeding to *learn* new facts or *build* a case. *Cf. Harris v. Nelson, supra*, 394 U.S. at 297 (holding that broad-ranging inquiry is neither necessary nor appropriate in habeas corpus proceedings).

### B.  Forensic, Trace, and Physical Evidence

Petitioner also requests a host of trace and physical evidence. He seeks an inventory of, and access to, all items of evidence from or near the scene of the murder of Damico Watkins; he asks for a inventory of, and access to, all recordings, photographs, diagrams, or other notes depicting or describing the crime scene, the victim's body, the recovery of the body, or the gathering of evidence.

In support of this request, petitioner states in his memorandum in support that any determination of his constitutional claims, particularly of his various claims of actual innocence, requires a careful examination of the physical evidence. He suggests that trace evidence from the body of the decedent could identify the characteristics of the assailant, the weapon that

inflicted the lethal wounds, and the manner and order in which those wounds were delivered. (Doc. # 46, at 21.)  He further suggests that trace evidence near the scene is critical to any evaluation of the circumstances of the offense, "as they could be evaluated to identify the person or persons who left the door to the Adams Unit A cell block open."  (*Id.*)  In his reply memorandum, petitioner goes on to offer as a justification for these discovery requests the fact that he was never afforded his own forensic defense experts to assist him in examining the evidence "in the hope of obtaining proof of his claim that he neither intended to kill Watkins nor that he wielded the knife the witnesses placed in his hands, or at least cast doubt on those claims."  (Doc. # 55, at 11.)

Understanding that petitioner has never had the benefit of forensic expert to assist him in the examination of the forensic, trace, and physical evidence in this case, the Court is nonetheless constrained to find that petitioner has not advanced a single reason to believe that the gathering or production of evidence in his case was suspect, that any evidence was withheld from him, or that any such evidence could even arguably assist him in supporting his constitutional claims.  That being so, petitioner has not demonstrated good cause for this discovery request.

In its decision addressing petitioner's postconviction claims, the state trial court noted that the Court Administrator had received all of the discovery that petitioner's defense attorneys had received during pretrial preparation and that the trial court would be utilizing that information in its determination of petitioner's postconviction claims.  (App.Vol. V, at 202-203.) The trial court's exhaustive summary of the pretrial discovery in petitioner's case, which this Court will not recount herein, reveals that the State provided an abundance of physical evidence,

including photographs, diagrams, blueprints, video tapes, audio recordings, laboratory reports, and inventories and descriptions of physical evidence.  (App.Vol. V, at 203-204, 210-212.)  A review of the record from petitioner's postconviction proceedings, during which he had,  and availed himself of, the opportunity for extensive factual development of the record, reveals no reasonable basis for believing that any relevant physical evidence, much less exculpating physical evidence, was withheld from petitioner's trial counsel.

Further, petitioner has not explained, and it is not otherwise apparent to the Court, how the evidence that he requests could assist him in supporting his constitutional claims.  Trace evidence, contrary to petitioner's hope, is unlikely to help petitioner "identify the characteristics of any assailant, the weapon which ultimately inflicted the lethal wounds, and the manner and order in which those wounds were inflicted."  (Doc. # 46, at 21.)  Franklin County Coroner, Dr. Keith Norton, testified that the victim suffered forty stab wounds, six of which were lethal and could alone have caused death.  (Tr.Vol. IV, at 520, 525-26.)  The prosecution introduced as evidence six knives that were recovered from petitioner and his codefendants/accomplices immediately following the incident.  (Tr.Vol. IV, at 534-36.)  The State attempted, through Dr. Norton's testimony, to tie only two of the six lethal wounds to the knife that numerous witnesses put in petitioner's hand[4]–the longest of the six knives, i.e., State's Exhibit 3.  (Tr.Vol. IV, at 540-41.)  That said, Dr. Norton testified that it was just as likely that any of the other six knives could

---

[4]	The following eyewitnesses testified to having seen State's Exhibit 3 in petitioner's hand at some point during the incident: C.O. Michael Browing (Tr.Vol. IV, at 568); C.O. Timothy Follrod (Tr.Vol. V, at 766); C.O. J.W. Wolverton (Tr.Vol. V, at 785-86); and C.O. Charles Krueger (Tr.Vol. VI, at 914, 917).  Several other eyewitnesses testified that petitioner had the longest knife, but those witnesses were not asked to identify the knife by its exhibit number.  See, e.g., MaCI Sergeant Martha Crabtree, Tr.Vol. V, at 774.  Deputy Warden Mark Saunders also identified during trial which knife he had seen in petitioner's hand, but it is difficult to discern, from the precise nature of the question and answer in the transcript, which of the six knives, i.e., State's Exhibits 2 - 7, it was (Tr.Vol. V, at 657).

have caused four of the other lethal wounds. (*Id.*, at 543.) So even assuming that any trace evidence could undermine Dr. Norton's testimony about the two lethal wounds that were attributed to the long knife that petitioner was seen carrying–an assumption for which petitioner has provided no reasonable basis–that fact does not strike this Court as exculpatory. Regarding petitioner's dispute about whether or when, during the incident, he was wielding the knife that was attributed to him, the forensic evidence he requests is unlikely to shed any light on this question, given the testimony by the BCII latent print examiner, Russell McSaveny, that no fingerprints were found on any of the knife handles and that this was not surprising to him, given the various surfaces of those knife handles. (Tr.Vol. V, at 703-707.)

Finally petitioner's assertion that trace or physical evidence could assist him in "identify[ing] the person or persons who left the door to the Adams Unit A cell block open," (Doc. # 46, at 21), cannot be characterized as anything but unfounded. Petitioner Stojetz testified during his postconviction hearing, as did codefendants/accomplices James Bowling and William Vandersommen in their depositions, that the door to the Adams A unit was propped open by a pop can. (Tr.Vol. VIII, Tab 1, at 330; Tr.Vol. IX, Tab 1, at 40-41; Tr.Vol. IX, Tab 3, at 33.) Petitioner purports to have produced as an exhibit, *i.e.*, Exhibit BB, to his postconviction action a photograph of a pop can near the door of the Adams A unit shortly after the incident, but no such photograph appears in the record before this Court. (App.Vol. IV, at 186.) Testimony was also produced, however, suggesting that it might not have been unusual for the outer door to the Adams A unit to be closed but unlocked. *See, e.g.*, C.O. Michael Browning, Tr.Vol. IV, at 573; C.O. Gerald Nelson, Tr.Vol. VIII, Tab 2, at 18-19. Petitioner has not specified what he hopes to find from any trace or physical evidence that might shed further light on this subject,

much less how he hopes to find it. This request amounts to nothing more than the fishing expedition that is simply not permitted in federal habeas discovery. *Williams v. Bagley, supra*, 380 F.3d at 974. For the foregoing reasons, the Court concludes that petitioner has failed to demonstrate good cause for the forensic, trace, and physical evidence that he seeks.

### C. Statements and Reports

Petitioner also requests statements and reports, including an inventory and copies of all statements and all reports concerning the investigation of the death of Damico Watkins and/or the prosecutions of petitioner, his codefendants/accomplices, or any others. He seeks these records from MaCI, OSHP, BCII, ODRC, or any other state, local, or federal law enforcement agencies.

In support of this request, petitioner questions the investigations and interviews actually conducted, and the reports actually generated. For instance, petitioner argues that although there were approximately 130 juvenile inmates who were housed in Adams A unit at the time of the incident and questioned by investigators that day, the State called only three to testify. Petitioner argues the statements and reports that he requests are critical to his claims of actual innocence, ineffective assistance of counsel, and prosecutorial misconduct under *Brady* "[g]iven the already known evidence of the confessions of Vandersommen and Bishop as the actual killers...." (Doc. # 46, at 22.) He goes on to argue in his reply memorandum that "even the most cursory efforts on the part of post-conviction counsel produced testimony and evidence contradictory to the state's material witnesses' claims that he intended to cause the death of Damico Watkins or wielded the knife which struck the fatal blow." (Doc. # 55, at 12.) Petitioner complains that the transcripts and summaries of tape recorded statements and interrogations were never compared

to the actual recordings for accuracy and completeness. Petitioner also points out that his "codefendants now accept responsibility for the death of Watkins and corroborate Petitioner's assertions that he intended to fight Watkins and not to kill him, that the others were there to 'watch his back' and that codefendants Jerry Bishop and William Vandersommen 'went berserk.'" (Doc. # 55, at 12-13.) Petitioner states that the State withheld this evidence "through disingenuous *partial* disclosure to his trial attorneys." (*Id.*, at 55.)

Ohio State Highway Patrol lead investigator, Trooper Rick Downey, testified during petitioner's postconviction hearing that every transcript of all of the interviews of the inmates that were conducted after the incident had been provided to defense counsel. (Tr.Vol. VIII, Tab 1, at 258.) In its decision rejecting petitioner's postconviction claims, the trial court undertook a painstaking review of the "unprecedented" open discovery that the State provided (App.Vol. V, at 265), and noted, among other things, that all of the inmate witnesses' statements had been provided to defense counsel. (App.Vol. V, at 217.) Petitioner makes much of the fact that a comparison of Trooper Downey's full investigative report to the redacted report that was provided to defense counsel during pretrial discovery reveals that references to certain inmates' statements were redacted, allegedly for security reasons, (Tr.Vol. VIII, at 262-273). The fact that Trooper Downey may have redacted from his investigative summary references to certain inmate witnesses' statements does not change or diminish the fact that all of the inmate witnesses' statements themselves were provided to defense counsel. Petitioner's suggestion that the OSHP withheld exculpatory statements from petitioner's defense counsel merely because the State did not call every inmate as a witness at trial is simply unjustified. Further, defense counsel Jon Doughty testified in a postconviction deposition that he and co-counsel James

40

Doughty reviewed all of the statements that had been provided and that he (Jon) understood that, to the extent that there were juvenile inmates who appeared to have made no statements, it was because they had seen nothing. (Tr.Vol. VIII, Tab 3, at 6-7.) The fact that the State called only three juvenile inmates to testify does not, in this Court's view, establish good cause for the instant discovery request.

It also bears reiterating that the state trial court, in its decision addressing petitioner's postconviction claims, provided an exhaustive summary of the pretrial discovery in petitioner's case. The Court will not recount that summary here, but notes that the State provided an abundance of statements and reports. (App.Vol. V, at 203-212.) A review of the record from petitioner's postconviction proceedings, during which he had, and availed himself of, the opportunity for extensive factual development of the record, reveals no reasonable basis for believing that any statements or reports, much less exculpatory statements or reports, had been withheld from petitioner's trial counsel. Moreover, petitioner has failed to advance a single reason to question the accuracy, authenticity, or completeness of the transcripts and summaries that the State provided. That being the case, petitioner's intimations that the State withheld exculpatory information or that there is some reason to question the accuracy or completeness of the transcripts and summaries of interviews of inmate witnesses that the State did provide, are insufficient to establish good cause for production of the statements and reports that he requests. As noted above, habeas corpus "was never meant to be a fishing expedition for habeas petitioners to 'explore their case in search of its existence.'" *Rich v. Calderon, supra*, 187 F. Supp. 2d at 1067 (quoting *Aubut v. State of Maine*, 431 F.2d 688, 689 (1st Cir. 1970)).

The Court also reiterates its rejection as good cause petitioner's curious suggestion that

after-the-fact admissions by his codefendants constitute an example of the State having withheld evidence that demonstrated both his codefendants' guilt and his own innocence.  None besides Lovejoy was willing to speak to investigators or otherwise provide statements following the incident.  In postconviction, petitioner submitted an affidavit by Vandersommen dated February 23, 1998 (App.Vol. IV, at 40), and a deposition of Vandersommen that took place on September 8, 1999 (Tr.Vol. VIII, at Tab 3).  Vandersommen conceded that he probably would not have testified had defense counsel called him during petitioner's trial.  (*Id*., at 55.)  Petitioner also submitted an affidavit by James Bowling dated May 21, 1997 (App.Vol. IV, at 56), and a deposition of Bowling that took place on September 8, 1999 (Tr.Vol. IX, Tab 1).  Bowling said that "maybe" he would have testified had defense counsel called him during petitioner's trial.  (*Id*., at 58.)  Petitioner also submitted a statement that Phillip Wierzgac provided following his guilty plea on December 19, 1997 (App.Vol. IV, at 231), as well as an excerpt of testimony that Wierzgac provided during Bowling's trial (App.Vol. IV, at 353).  It does not appear that petitioner submitted in postconviction any affidavit, testimony, or statement by Bishop. Petitioner did submit as an exhibit a letter by Bishop to an individual named Kathy, dated August 30, 1996, stating, among other things, "10 niggers jump one of my friends and was going to jump me, so I got him first."  (App.Vol. IV, at 47.)  Even assuming that this letter was in the possession of the State, it does not strike this Court as an example of the State withholding evidence that demonstrated both Bishop's guilt and petitioner's innocence, insofar as the prosecution never contended at petitioner's trial that petitioner was the lone assailant or that Bishop did not also stab the victim.  As for other evidence, such as statements by inmate witnesses, that tended to demonstrate the guilt of Vandersommen and Bishop, and/or the

innocence of petitioner, the Court has noted repeatedly that the State provided to petitioner's defense counsel all of the statements that investigators obtained from the inmate witnesses who were housed in Adams A unit at the time of the incident.

In short, petitioner does not explain, and it is not otherwise apparent to the Court, how the prosecution withheld statements that post-dated petitioner's trial and were generated through petitioner's own initiative. That being so, petitioner's argument in this regard fails to establish good cause for his request for the statements and records set forth in his discovery motion.

### D. Depositions

Finally, petitioner seeks to depose at least thirty-one people, including the prosecuting attorneys, an employee of the Madison County Clerk of Courts, employees of MaCI and ODRC, employees of OSHP, his own trial and postconviction attorneys, and numerous current or former inmates. Petitioner has failed to demonstrate good cause to depose any of these individuals because he has failed to offer anything beyond conclusory allegations–and for some, not even that–justifying his request.

As good cause to depose the prosecuting attorneys in his case, including but not limited to Stephen J. Pronai and Daniel A. Huston, petitioner states in his memorandum in support that the depositions are necessary to establish facts in support of his claims that his death sentence is invalid and arbitrary, that his trial attorneys' performances were deficient, and that the prosecution did not disclose evidence that was inconsistent with its theory or otherwise exculpatory. In his reply memorandum, petitioner explains that he also anticipates developing evidence to demonstrate that the prosecution deliberately mislead the jury during voir dire, opening and closing statements, and in mitigation. Petitioner does not offer any reason to

43

conclude that the prosecuting attorneys would provide the information he seeks or that such information would materially assist him in proving any of his constitutional claims.  Further, this Court has noted several times in this order that petitioner has offered no reason to conclude that the State withheld exculpatory or conflicting evidence.

In support of his request to depose the criminal court clerk for the Madison County Court of Common Pleas, petitioner states that "a question arises whether the Madison County Clerk of Courts destroyed various items of evidence in this matter before this case came to federal court." (Doc. # 46, at 23.)  Petitioner fails to offer any support for this conclusory assertion and, as such, he fails entirely to establish good cause to conduct this deposition.

In an effort to demonstrate good cause to depose MaCI, ODRC, and OHSP personnel–*i.e.*, C.O. Michael Browning, C.O. John Vanover, Administrative Assistant Walt Ashbridge, former lieutenant/C.O. Gerald Nelson, C.O. Matthew Robert Meyer, Trooper Alan Wheeler, Trooper Ron Nichols, Trooper Rick Downey, Criminalist Jeffrey William Turnau, and OSHP Sergeant Timothy Tuttle–petitioner identifies only Ashbridge and Downey by name in his memorandum in support and states that depositions of them will "enable petitioner to identify the full extent of the investigation of this offense, in order that he may fully identify all investigators, all investigation done, all statements obtained, all physical and trace evidence collected, and all potentially exculpatory evidence revealed through the investigation."  (Doc. # 46, at 23.) Trooper Rick Downey was the lead investigator for OSHP and Walt Ashbridge was the lead investigator for MaCI.  This Court concludes that petitioner has failed to provide a reasoned basis for questioning the manner in which evidence and statements were collected, organized and maintained, or disclosed.

Petitioner goes on to argue in his reply memorandum, without identifying any of the proposed deponents by name, that the depositions will provide evidence in support of his defense that was never presented at trial or in mitigation, including evidence regarding gang activities, the atmosphere at MaCI in the days and weeks leading up to the murder, the knowledge of MaCI and ODRC staff of the volatile situation at MaCI, and the securing and preserving of physical evidence and statements.  All of the proposed deponents set forth above testified at petitioner's trial, postconviction hearing, or both.  Petitioner has failed to advance a specific justification for obtaining any testimony beyond what the proposed deponents have already provided.  *See Sanborn v. Parker*, 289 F. Supp. 2d 818, 823 (W.D. Kentucky 2003) ("An attempt simply to repeat the prior inquiry, without some particularized showing, is not adequate.").  Further, the Court has already determined that the record is sufficiently developed regarding the heart of the issues that petitioner seeks to prove, as evidenced, for example, by the trial court's sentencing decision alone, in which the trial court explicitly recognized the gang affiliations and activities of the victim, petitioner, and petitioner's codefendants/accomplices; the attempt by MaCI personnel to monitor those activities; and the "volatile mix" present at MaCI in the days and weeks leading up to the incident.  (App.Vol. V, at 198-99.)  Further, as noted immediately above and also throughout this order, petitioner has advanced no substantial reason for questioning the manner in which evidence and statements were collected, maintained and organized, or disclosed.

In an effort to demonstrate good cause to depose his trial attorneys, James and Jon Doughty, as well as his postconviction attorneys, John J. Gideon and Cordelia A. Glenn, petitioner states in his reply memorandum that, contrary to findings made by the trial court in its decision rejecting petitioner's postconviction claims, no strategic reasons existed that would

45

justify trial counsel's perfunctory performance on petitioner's behalf.  James and Jon Doughty testified during petitioner's postconviction hearing.  Additionally, the State deposed Jon Doughty in connection with petitioner's postconviction proceedings.  Petitioner has failed to establish good cause to secure testimony beyond what his trial attorneys have already provided regarding their investigation, preparation, and implementation of strategies for the trial and mitigation phases of the trial.  *See Sanborn v. Parker, supra*, 289 F. Supp. 2d at 823 (finding no good cause where petitioner sought "to do nothing more than engage in ill-defined, open-ended discovery in the hope he might elicit a different response from this particular witness with questions posed by different counsel.").  James Doughty is now deceased and, to the extent that Jon Doughty could not recall information about petitioner's trial or the investigation and strategies that trial counsel pursued, it is unlikely that the passage of time would enhance his recollection.

Petitioner seeks to depose his postconviction attorneys in an effort to demonstrate their inability to obtain exculpatory evidence, their frustrations with the process limiting access to evidence, the limitations of issues available to them in postconviction due to the ineffectiveness of petitioner's attorneys on direct appeal, and the alleged wholesale abandonment of petitioner by one of his postconviction attorneys, John J. Gideon, due to this counsel's failure to appeal the decision by the trial court rejecting petitioner's postconviction claims.  Petitioner has failed to demonstrate good cause for these depositions because, in short, he can establish nothing through these depositions that would assist him in proving either that he is entitled to relief on any constitutional claims or that he can satisfy the "actual innocence" exception for reviewing claims that would otherwise be barred by procedural default.

Petitioner also seeks to depose a number of current or former inmates, including his codefendants/accomplices, but beyond offering a laundry list of claims in his reply memorandum that would allegedly be bolstered by the depositions (Doc. # 55, at 14), petitioner does not advance a single justification for the depositions of any of the named individuals.  Regarding his request to depose his codefendants/accomplices, petitioner provided in postconviction affidavits and deposition testimony from codefendants/accomplices James R. Bowling and William Vandersommen.  He also submitted in postconviction a statement that codefendant Phillip Wierzgac provided following his own guilty plea, as well as an excerpt of testimony that Wierzgac then provided during the trial of James Bowling.  Petitioner did not submit in postconviction any direct statements, affidavits, or testimony by codefendants Jerry Bishop or David Lovejoy.  Petitioner has not offered any justification for deposing Bowling and Vandersommen again, or deposing Wierzgac, Bishop, and Lovejoy for the first time now.  Rule 6 and relevant case law place the burden for demonstrating good cause on the movant and petitioner has failed to carry that burden.

Petitioner also seeks, without a single word of explanation, to depose Prentiss Williams, John McDermott, David Hicks, Dough Haggerty, Alfonso Greer, Andre Wright, Sidney Taylor, Roman Ward, and Brandon Hill–all of whom were juvenile inmates housed in the Adams A unit at the time of the murder.  Greer, Wright, and Taylor testified against petitioner at his trial, and petitioner called Haggerty as a defense witness during trial; in his postconviction proceedings, petitioner submitted an affidavit and deposition testimony of David Hicks, an excerpt of testimony by Brandon Hill from Bishop's trial, and a transcript of Hill's statement to Trooper Long following the incident.  Of the other current or former inmates whom petitioner seeks to

47

depose, two are of particular interest to the Court *because* of petitioner's failure to offer even one word of explanation as to what they might have to offer.  Prentiss Williams and John McDermott were cellmates in the Adams A unit at the time of the incident.  They did not testify at petitioner's trial.  During his state postconviction proceedings, petitioner did not provide any statements by them or call them to testify at his hearing.  The trial court, in its exhaustive summary of statements taken from the juvenile inmate witnesses, made no mention of them.  Petitioner obviously has a reason for wanting to depose these individuals, but he has failed entirely to explain that reason.  That being so, he has not demonstrated good cause to depose them.

### V.  Conclusion

In conclusion, the Court is constrained to **DENY** petitioner's motion for leave to conduct discovery (Doc. # 46).  In so doing, the Court has carefully considered not only petitioner's motion, memorandum in support, and reply memorandum, but also the habeas petition, the appendix and transcript volumes, and the Court's previous rulings.  In death penalty habeas corpus cases such as this, the Court would prefer to err on the side of gathering too much information, rather than too little.  But this Court's preference is not without limitations.  It bears reminding that habeas corpus litigants, even those sentenced to death, are not entitled to discovery as a matter of course and must, instead, demonstrate good cause by "point[ing] to specific evidence that might be discovered that would support his constitutional claims...." *Burns v. Lafler*, 328 F. Supp. 2d 711, 718 (E.D. Mich. 2004) (citing *Marshall v. Hendricks*, 103 F. Supp. 2d 749, 760 (D.N.J. 2000), *rev'd in part on other grounds*, 307 F.3d 36 (3rd Cir. 2002)).  Petitioner failed to meet this burden.  Petitioner stated throughout his memorandum in support

and reply memorandum that this Court's previous rulings–specifically those issued on September 30, 2005, and February 10, 2006, relating to procedural default–invited and anticipated discovery.  But nothing in those rulings can reasonably be construed as holding that petitioner does not need to demonstrate good cause for the expansive discovery that he seeks, or that he has already done so.

Simultaneously with filing his motion for discovery, petitioner also filed an *ex parte* motion for funds for investigative/expert assistance.  Petitioner acknowledged in his reply memorandum his filing of that motion, (Doc. # 55, at 11 n.4), but because that motion was filed *ex parte*, the Court will not discuss it further herein. It is sufficient for purposes of the instant discovery motion to note that the Court is inclined to grant petitioner's *ex parte* motion and that, if warranted and filed within a reasonable period, the Court would be willing to entertain a subsequent *good faith* motion for discovery.  The Court will address in a separate order the motions that petitioner filed *ex parte*.  The Court will address in its final opinion and order on the merits any unresolved issues concerning petitioner's ability to demonstrate the cause-and-prejudice and/or actual innocence exceptions to procedural default.

For the foregoing reasons, petitioner's first motion for discovery (Doc. # 46) is **DENIED**. In accordance with the December 22, 2004, Scheduling Order (Doc.# 22), the Court will convene a status conference to establish a new briefing schedule and address any other issues that might be necessary.

      /s/   **Gregory L. Frost**      
**GREGORY L. FROST**
**United States District Judge**